ALICE G. SNAVELY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Snavely v. Commissioner
Docket No. 20036-92
United States Tax Court
T.C. Memo 1994-256; 1994 Tax Ct. Memo LEXIS 253; 67 T.C.M. (CCH) 3056; June 6, 1994, Filed *253 For petitioner: William R. Cousins III and Steven D. Erdahl. For respondent: Daniel C. Brauweiler and Ann S. O'Blenes. MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined the following deficiencies in, and additions to, petitioner's Federal income taxes: Additions to Tax
Year
Deficiency
Sec. 6653(b)
Sec. 6661 Sec. 6663 1987
$ 45,997
[1] $ 34,498
$ 11,499
--
1988
51,671
38,753
12,918
--
1989
48,476
--
--
$ 36,357
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. The claimed deficiencies arise from respondent's determination that petitioner misappropriated funds (through embezzlement) during each of the 3 years in issue from Royal Lane Village, Ltd., a Texas limited partnership in which petitioner held a 5-percent limited partnership interest. Petitioner contends that the funds withdrawn from Royal Lane Village, Ltd., were loans and thus nontaxable. Accordingly, after concessions, the issues for decision are: (1) *254 Whether petitioner's withdrawals of partnership funds constitute unreported embezzlement income, as respondent contends, or loans, as petitioner contends; (2) if such withdrawals are unreported income, then whether petitioner may utilize section 1341 to mitigate the amount of her tax liability with respect to such income; and (3) whether petitioner is liable for additions to tax for substantial understatement pursuant to section 6661 and additions to tax for fraud pursuant to sections 6653(b) and 6663. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner resided in Dallas, Texas, at the time the petition in this case was filed. Petitioner completed her formal education with her graduation from high school in 1945. She then went to work at Neiman Marcus in its credit office. She held a variety of positions there until 1956, when she went to work for Stanley Marcus, the then CEO of Neiman Marcus, as his secretary. In 1976, Mr. Marcus became chairman emeritus of Neiman Marcus and started a consultancy business. Petitioner continued to work for Mr. *255 Marcus until 1990, and was his personal assistant during the years in issue. During all these years, she remained on Neiman Marcus' payroll. Petitioner and Mr. Marcus had a very close relationship. Petitioner thought of Mr. Marcus as her "second father". Over her 34-year association with Mr. Marcus, petitioner developed extraordinary business skills. Mr. Marcus considered petitioner to be "extraordinarily competent" and thus relied heavily on petitioner to handle his financial affairs. Mr. Marcus gave petitioner a 10-percent equity interest in his consulting practice to compensate her for additional services rendered. In addition, during the years at issue, petitioner had a power of attorney to handle Mr. Marcus' business affairs in his absence. Petitioner owned minority interests in several of Mr. Marcus' investment undertakings. One such investment undertaking was Royal Lane Village, Ltd. (RLV), which owned and operated a Government-subsidized apartment complex pursuant to section 236 of the National Housing Act. The apartment complex is a low-rent complex, contains 240 units, is located on Royal Lane in Dallas, and is coverned by the Department of Housing and Urban Development *256 (HUD) regulations. Mr. Marcus was the sole general partner of RLV, with a 95-percent equity interest; petitioner was the sole limited partner of RLV, with a 5-percent equity interest. Globus Management (Globus) was formed to facilitate the management of RLV and other apartment projects. Globus was responsible for the management and payroll of the projects, as necessitated by HUD requirements. Petitioner and Mr. Marcus each held a 50-percent interest in Globus during the years in issue. Globus frequently made loans to entities owned in part by Mr. Marcus. When such loans were made, there was usually a contemporaneous writing or document to reflect the loan transaction. Petitioner and Mr. Marcus were the only signatories on the RLV checking accounts during 1987, 1988, and 1989. Petitioner signed approximately 95 percent of all checks drawn on RLV checking accounts. Typically, the checkbook was left with petitioner for 3 or 4 days while she signed the checks. On occasion, petitioner took the RLV checkbook home with her. The accounting firm of Cheshier and Fuller both prepared RLV's tax returns and audited its books and records during the years in issue. RLV checks were coded *257 in order to show the purpose of each expenditure as represented by each check. Petitioner coded most of the check stubs; those check stubs that were not coded by petitioner were coded by RLV's accountants. During 1987, 1988, and 1989, petitioner supervised the management of RLV. She used partnership checks to pay her personal expenses. In this regard, she miscoded the checks drawn on the RLV checking account that were used to pay her personal expenses. Petitioner's personal expenses paid with RLV funds included, among other things, art objects (including an $ 8,000 brass buddha), weekly pool maintenance, extensive landscaping in excess of $ 70,000 for petitioner's personal residence, and a state-of-the-art outdoor lighting system for petitioner's personal residence costing in excess of $ 25,000. As to many of these purchases, petitioner presented the seller with a tax resale certificate in the name of Neiman Marcus; petitioner represented herself as a buyer for Neiman Marcus, which was exempt from State sales tax. In 1988, Mr. Marcus and petitioner, as partners of RLV, took a distribution of $ 238,084, their total legal entitlement to partnership moneys ("surplus cash", as *258 defined by HUD) that had accrued over the prior several years. In 1989, Mr. Marcus received a yearend surplus cash distribution from RLV of $ 27,376 and petitioner received a yearend distribution of $ 1,441, their total legal entitlement to surplus cash for that year. Lee Cheshier performed the audit of RLV during the years in issue. He discovered missing invoices while conducting the audit of RLV, and noted this in a handwritten note contained in the audit workpapers. J. King Bourland, a C.P.A at Cheshier and Fuller, reviewed the 1989 audit of RLV as prepared by Mr. Cheshier shortly after its preparation. Mr. Bourland was made aware of Mr. Cheshier's concern over missing invoices when he reviewed the audit and Mr. Cheshier's handwritten comments. In March 1990, based on petitioner's unusual behavior, Mr. Marcus contacted Mr. Cheshier and directed the accountant to deliver RLV's ledger books to him. In April 1990, Mr. Marcus discovered what he considered misappropriations by petitioner of partnership assets. Mr. Marcus then directed Mr. Cheshier to verify and document that petitioner had indeed misappropriated funds. Mr. Cheshier approached Frank Branscome, RLV's property *259 manager, and requested to see the invoices for the ledger items in question. No such invoices were in RLV's files; in fact, RLV did not do business with the companies in question. Mr. Marcus confronted petitioner on April 21, 1990. At first, petitioner denied any wrongdoing, but eventually she apologized for her actions. At no time did petitioner represent to Mr. Marcus that she believed she was entitled to the partnership moneys that she used to pay her personal expenses. Petitioner's working relationship with Mr. Marcus ended on or about May 1, 1990. Petitioner was replaced as the sole limited partner of RLV on July 24, 1990. RLV filed amended partnership returns for 1987, 1988, and 1989. On these amended returns, the amount of deductions previously claimed was reduced and the amount of net distribution income reported was increased. RLV filed a civil lawsuit against petitioner alleging that she willfully, knowingly, and maliciously misappropriated funds from RLV during 1987, 1988, and 1989. The lawsuit was settled by the parties prior to trial. As part of the settlement agreement, petitioner paid RLV a lump sum of $ 509,441 in June 1990. This lump-sum payment constituted *260 a repayment to RLV of partnership funds in the amount of $ 139,848 for 1987, $ 171,686 for 1988, $ 161,962 for 1989, and $ 35,945 for 1990. Incident to the settlement agreement, petitioner agreed to transfer to Mr. Marcus her entire interest in RLV. Mr. Marcus filed a criminal complaint against petitioner with the Specialized Crime Division of the Dallas District Attorney's office. After petitioner made full restitution to RLV, Mr. Marcus withdrew his complaint. Mr. Marcus testified that he withdrew his complaint because he believed the State would not benefit by petitioner's serving a prison sentence. Petitioner repaid the funds just prior to Mr. Marcus' appearance before the grand jury. OPINION Issue 1. Petitioner's Withdrawals Constitute Taxable Income
Petitioner asserts that the partnership withdrawals in issue were nontaxable loans. Respondent asserts that the funds were embezzlement income, and, as such, represented taxable income in the year received. Petitioner bears the burden of proving that respondent's determinations are erroneous. Rule 142(a). It is well settled that money obtained by means of embezzlement constitutes income to the perpetrator. When *261 a taxpayer acquires earnings, lawfully or unlawfully, without recognition of an obligation to repay and without restriction as to its disposition, taxable income is deemed to have been received, even though the taxpayer may be required to repay the money at a later date. James v. United States, 366 U.S. 213, 219-220 (1961); North American Oil Consol v. Burnet, 286 U.S. 417, 424 (1932); Mais v. Commissioner, 51 T.C. 494, 498-499 (1968). Whether the individual receives the money lawfully or unlawfully is irrelevant. James v. United States, supra.There is no requirement that there be a prior judicial determination that an embezzlement has occurred; such determination is within the compass of the Court. See, e.g., Solomon v. Commissioner, T.C. Memo. 1982-603, affd. 732 F.2d 1459 (6th Cir. 1984); Beaton v. Commissioner, T.C. Memo. 1980-413, affd. 664 F.2d 315 (1st Cir. 1981); Nuckols v. Commissioner, T.C. Memo. 1970-308. *262 Turning to the instant case, RLV is a Texas partnership governed by the Texas Uniform Partnership Act (Act). Section 25(2)(a) of the Act provides that a partner "has an equal right with his partners to possess specific partnership property for partnership purposes; but he has no right to possess such property for any other purpose without the consent of his partners". Tex. Rev. Civ. Stat. Ann. art. 6132(b), sec. 25(2)(a) (West 1993). Likewise, section 18(1)(h) of the Act provides that "no act in contravention of any agreement between the partners may be done rightfully without the consent of all the partners". Tex. Rev. Civ. Stat. Ann. art. 6132(b), sec. 18(1)(h) (West 1993). Notwithstanding petitioner's denial, it is clear that petitioner misappropriated RLV partnership property, and that she spent such funds on personal, nonpartnership items. Other than her own self-serving testimony that she intended to repay the money, petitioner provided no credible evidence to support her claim that, at the time she removed the funds from RLV's accounts, she intended to repay the moneys at a future date. At the time petitioner appropriated the funds for her own benefit, she made no contemporaneous *263 writings evidencing such intent. She concealed the withdrawals by miscoding the pertinent check stubs as "repair expenses". To deflect scrutiny and to avoid the payment of State sales tax, she utilized a tax resale certificate. She took the funds without notifying or getting authorization from Mr. Marcus. When Mr. Marcus accused her of misappropriating partnership funds, she denied ever having taken such funds. And she did not pay back the amounts withdrawn until the eve of the grand jury indictment, well after her actions had been discovered. In contrast, respondent presented evidence that RLV did not consent to the loans. There were no notes evidencing the loans. Mr. Marcus testified that he did not give petitioner permission to borrow the money. The RLV partnership agreement provided for a distribution of profits or repayment of capital only out of surplus cash. Surplus cash, as defined by the HUD Regulatory Agreement, was computed at 6 percent of the initial equity investment in the project. Thus, the gross surplus cash disbursement to all partners could not exceed $ 28,821 per year. Petitioner's maximum annual entitlement, as governed by the partnership agreement, *264 was 5 percent of this amount, or $ 1,441. Yet petitioner withdrew $ 139,848 in 1987, $ 171,686 in 1988, and $ 161,962 in 1989. These withdrawals exceed her annual legal entitlement by an average of over 10,000 percent per year during the years in issue. Petitioner's argument that she believed she was entitled to such unusually large withdrawals is not persuasive. All of petitioner's actions were designed to conceal her withdrawals of partnership moneys. Absent a bona fide consensual agreement between the party providing the money (here, the partnership) and the party receiving it (here, petitioner), there can be no support for the contention that money received should be excluded from gross income on a loan theory. Therefore, it must be treated as income. Moore v. United States, 412 F.2d 974, 979-980 (5th Cir. 1969); see also Kreimer v. Commissioner, T.C. Memo. 1983-672. For the above-stated reasons, we conclude that petitioner's withdrawals of RLV's funds constitute unreported embezzlement income; accordingly, we sustain respondent's deficiency determinations. Issue 2. Petitioner May Not Utilize Section 1341 *265 To Mitigate Her Taxable Income
Section 1341 permits an alternative and advantageous computation of tax where a taxpayer restores in one taxable year a substantial amount held under a claim of right and included in gross income during a prior taxable year. In the instant case, petitioner asserts her entitlement to use section 1341. We have already examined whether petitioner had any claim of right to the funds. We found petitioner's possession of the funds wrongful as against the partnership, as she did not hold the funds for a partnership purpose under the terms of the partnership agreement or with the consent of her partner (Mr. Marcus). Accordingly, petitioner did not have an unrestricted right to these amounts. As an embezzler, petitioner did not receive her funds under a claim of right. Consequently, petitioner may not benefit from the claim of right relief doctrine embodied in section 1341. McKinney v. United States, 574 F.2d 1240 (5th Cir. 1978); Yerkie v. Commissioner, 67 T.C. 388 (1976). Issue 3. Petitioner Is Liable for the Additions to Tax for Fraud and Substantial Understatement
Respondent *266 determined that petitioner was liable for the fraud additions to tax pursuant to section 6653(b) for 1987 and 1988, and section 6663 for 1989. Section 6653(b) provides an addition to tax equal to 75 percent of the underpayment if any part of the underpayment is due to fraud. Section 6663 provides an addition to tax equal to 75 percent of the underpayment if any part of the underpayment is due to fraud. An underpayment of tax is due to fraud if it results from a taxpayer's specific intent to evade a tax which the taxpayer believes that he owes. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601. Thus, in order to prove that an underpayment is due to fraud, the Commissioner must show that the taxpayer intended to evade a tax known to be due by engaging in conduct designed to conceal, mislead, or otherwise prevent the collection of such tax by the Commissioner. Patton v. Commissioner, 799 F.2d 166, 171 (5th Cir. 1986), affg. T.C. Memo. 1985-148; Recklitis v. Commissioner, 91 T.C. 874, 909 (1988). The *267 Commissioner bears the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). The existence of fraudulent intent is a factual question to be decided on the basis of an examination of the entire record. Recklitis v. Commissioner, supra at 909; Grosshandler v. Commissioner, 75 T.C. 1, 19 (1980). It may never be presumed but must be established by affirmative evidence. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Because direct proof of a taxpayer's intent is rarely available, however, fraud may be established by circumstantial evidence. Grosshandler v. Commissioner, supra at 19; Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). To satisfy her burden of proof, the Commissioner must show two things. First, the Commissioner must prove that an underpayment exists. (Here, respondent has established the existence of a deficiency.) Second, the Commissioner must show that the taxpayer intended to evade *268 taxes known to be owing by engaging in conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Rowlee v. Commissioner, 80 T.C. 1111 (1983). Courts have developed various factors or "badges" which tend to establish fraud. Recklitis v. Commissioner, supra at 874. These include: (1) A pattern of understatement of income; (2) inadequate records; (3) concealment of assets; (4) income from illegal activities; (5) attempting to conceal illegal activities; (6) implausible or inconsistent explanations of behavior; and (7) dealing in cash. Bradford v. Commissioner, supra at 308; McGee v. Commissioner, 61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). Several of these "badges" of fraud exist in this case. First, there is a pattern of understatement of income. In evidence are facts which, taken together, establish a pattern of substantial and intentional understatements of taxable income of $ 134,944 *269 in 1987, $ 172,336 in 1988, and $ 160,531 in 1989. Although fraud cannot be inferred from the mere understatement of income, consistent and substantial underreporting is evidence of fraud. Webb v. Commissioner, 394 F.2d 366, 379 (5th Cir. 1968), affg. T.C. Memo. 1966-81. Repeated understatements in successive years, when coupled with other circumstances showing an intent to conceal or misstate taxable income, present a basis on which we may properly infer fraud. Patton v. Commissioner, 799 F.2d 166, 171 (5th Cir. 1986), affg. T.C. Memo. 1985-148; Anderson v. Commissioner, 250 F.2d 242, 250 (5th Cir. 1957), affg. on this issue T.C. Memo. 1956-178. In addition, petitioner kept incomplete and inaccurate records, attempted to make implausible explanations regarding her behavior, concealed her illegal activities regarding the embezzlement, and intended to mislead. Further, when purchasing personal items with the embezzled funds, petitioner wrongfully presented to merchants a tax resale certificate, even though *270 she knew, at the time of purchase, that her purchases were not intended for resale. By doing so, petitioner committed an act of fraud against the State of Texas by unlawfully evading State sales taxes. We find and thus hold that petitioner willfully and knowingly intended to evade the payment of Federal income tax for the years 1987, 1988, and 1989, and therefore is liable for additions to tax under sections 6653(b) and 6663. Therefore, we sustain the addition to tax for fraud under section 6653(b) for 1987 and 1988, and section 6663 for 1989. Section 6661 provides for an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. Under section 6661(b)(1)(A), a substantial understatement is defined for individual taxpayers as the greater of $ 5,000 or 10 percent of the tax required to be shown on the return. The amount of the understatement is reduced by the portion of the understatement attributable to the tax treatment of any item if there is or was substantial authority for the treatment, or if there was adequate disclosure of the relevant facts affecting treatment of the item in the return or a statement *271 attached to it. Sec. 6661(b)(2)(B). The amount of the deficiency in petitioner's Federal income taxes for 1987 and 1988 meets the definition of a substantial understatement for this purpose. Petitioner did not have substantial authority for her position in any year in issue. Likewise, she did not adequately disclose any facts pertaining to the understated income on any of the tax returns as filed, or on any statements attached to such returns. Accordingly, we sustain respondent's determination with respect to petitioner's liability for the additions to tax under section 6661. To reflect concessions by respondent, Decision will be entered under Rule 155. Footnotes
1. Plus 50 percent of the interest due on the deficiency.↩